IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

KATRINA D. HADLEY,

      **Plaintiff,**

**vs.**                            **CIVIL ACTION NO. 3:18-CV-01190**

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered July 31, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant Brief in Support of Defendant's Decision. (ECF Nos. 12 and 15)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 12), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 15); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Katrina D. Hadley (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on August 31, 2015 alleging that her disability began on May 4, 2015 because of "neurogenic bladder, spina bifida, type II diabetes, tethered spine, 7 bulging disc[s], high blood pressure, [and] depression."[1] (Tr. at 242-243, 244-249, 269) Her claims were initially denied on November 23, 2015 (Tr. at 161-164, 165-167) and again upon reconsideration on January 7, 2016. (Tr. at 175-181, 182-186) Thereafter, Claimant filed a written request for hearing on January 15, 2016. (Tr. at 187-189)

An administrative hearing was held on October 17, 2017 before the Honorable Anne Shaughnessy, Administrative Law Judge ("ALJ"). (Tr. at 85-103) On December 22, 2017, the ALJ entered an unfavorable decision. (Tr. at 8-28) On January 2, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 235-241) The ALJ's decision became the final decision of the Commissioner on June 14, 2018 when the Appeals Council denied Claimant's Request. (Tr. at 1-7)

On July 28, 2018, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant, (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9 and 10) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 12); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 15) Consequently, this matter is fully briefed and ready for

---

[1] Claimant alleged that she stopped working on July 27, 2015 "because of other reasons" but explained that the company she worked for "couldn't deal with [her] medical conditions": she was fired because she could not lift 60-95-pound boxes of paper. (Tr. at 270) She had bladder surgery on May 4, 2015 and returned to work on June 22, 2015 and then was hospitalized for three days – when she returned back to work, she was let go because her medical conditions prevented her from doing her job. (Id.)

resolution.

**Claimant's Background**

Claimant was 44 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 265) Claimant has a high school education plus two years of college. (Tr. at 270) Her work history includes employment as a server/waitress, cook, with the most recent being a laborer in a warehouse. (Tr. at 271)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f),

416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 of this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the

technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## **Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2019. (Tr. at 13, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of May 4, 2015. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: neurogenic bladder; lumbar spondylosis; degenerative disc disease; obesity; diabetes mellitus; and depressive disorder. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 14, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work, "except she can cannot climb ladders, ropes, or scaffolds. She can occasionally stoop. She can perform tasks that are not fast paced in nature in a static work environment that does not require strict production deadlines." (Tr. at 16, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing past relevant work. (Tr. at 20, Finding No. 6) At the final step, the ALJ determined that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there are jobs that exist in significant numbers in the national economy that Claimant can

perform. (Tr. at 21, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under

a disability from May 4, 2015 through the date of the decision. (Tr. at 22, Finding No. 11)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant asserts that the ALJ erred on numerous grounds: that she failed to consider all

the evidence with respect to her neurogenic bladder; that because Claimant must self-catheterize

every 1-2 hours which takes 15-20 minutes resulting in being off-task between 12% and 33% of

the workday, Claimant is unemployable in a competitive economy; that the vocational expert

specifically testified that being off-task more than 10-15% precludes employment which the ALJ

failed to acknowledge; that the ALJ failed to give proper weight to the opinion of Claimant's

treating nurse practitioner, and disregarded same; that the ALJ failed to consider the evidence

provided by Claimant's treating physical therapist; that the ALJ failed to consider the consultative

examiner's finding moderate impairment due to Claimant's spina bifida, back pain and neurogenic

bladder; that the ALJ's evaluation of Claimant's subjective symptoms pursuant to SSR 16-3p fails

to comply with the Regulations; and finally, that the ALJ's RFC assessment is fatally flawed

because it fails to consider all of Claimant's impairments in contravention to the evidence. (ECF

No. 12 at 5-7)

Claimant asks this Court to reverse the decision below and award her benefits, or

alternatively, remand this case to correct the errors below. (<u>Id</u>. at 7)

In response, the Commissioner argues that the vocational expert's testimony confirmed

that unscheduled breaks every two hours for fifteen minutes is acceptable off-task behavior, and

the evidence did not support Claimant's need for an unscheduled break every hour for fifteen

minutes, therefore the ALJ properly accounted for Claimant's limitations with respect to her

neurogenic bladder. (ECF No. 15 at 15) The ALJ also properly evaluated the medical source opinion evidence pursuant to the Regulations, particularly with regard to Claimant's nurse practitioner, Ms. Leffingwell, whose opinion was inconsistent with the other evidence of record. (Id. at 16) To the extent the medical source opined on an issue reserved to the Commissioner, the ALJ was under no duty to give such an opinion any significance. (Id. at 17) Further, the ALJ explained her reasoning for the weight she gave to the opinion provided by the consultative examiner, Dr. Nutter; significantly, the ALJ noted that the objective findings did not support any significant functional limitations. (Id. at 17-18)

With respect to Claimant's subjective statements, the Commissioner points out that Claimant provides no instances of the objective evidence that supported her complaints, however, the ALJ pointed to specific examples from the record that showed Claimant's subjective statements were not entirely consistent with the evidence and provided clear reasons explaining her rationale in her analysis. (Id. at 19-20)

The Commissioner asserts that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 20)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Neurogenic Bladder Treatment:

In December 2014, Claimant was admitted to the hospital for suprapubic pain and leaking of urine around a Foley catheter. (Tr. at 430) She was started on antibiotics because her urinalysis

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

was suggestive of a urinary tract infection. (Id.) Lawrence W. Wyner, M.D., recommended removal of the Foley catheter and that Claimant resume repeated self-catheterization. (Id.)

On February 19, 2015, Charles Stephen Woolums, M.D., saw Claimant for management of neurogenic bladder and possible bladder sling. (Tr. at 951) Claimant reported that she self-catheterized 3 times a day. (Id.) Dr. Woolums noted that Claimant had neurogenic bladder dysfunction due to spina bifida. (Tr. at 952) Dr. Woolums recommended surgical intervention to achieve urinary continence and allow for effective catheterization. (Tr. at 955)

On March 2, 2015, Dr. Woolums performed antologous pubovaginal sling (PVS), urethral reconstruction, and cystoscopy. (Tr. at 511) On March 26, 2015, Dr. Woolums saw Claimant for follow-up care: Claimant reported no problems with catheterization. (Tr. at 929) Dr. Woolums noted that Claimant had catheterized more than 4 hours ago, with no leakage. (Tr. at 931)

On April 20, 2015, Claimant was admitted to the hospital after an uneventful fascia harvest and pubovaginal sling. (Tr. at 496-497) A catheter was left in place, and Claimant had a relatively benign postoperative course. (Tr. at 497) She was discharged home on prophylactic antibiotics. (Id.) The following day, Dr. Woolums saw Claimant status post PVS and urethral reconstruction. (Tr. at 921) Claimant reported that she was catheterizing every 2-3 hours. (Id.)

On May 7, 2015, Dr. Woolums performed a cystoscopy for hematuria and to identify an intravesical source. (Tr. at 914) Claimant's continence was improving and her hematuria had resolved. (Id.) Dr. Woolums wrote a note stating that Claimant should have a leave of absence on May 7, 2015 and could return to work on May 8, 2015. (Tr. at 913)

On May 14, 2015, Claimant reported that she was self-catheterizing every 3 hours. (Tr. at 1253)

On May 20, 2015, Rafael Molina, Jr., M.D., saw Claimant for an annual gynecologic examination. (Tr. at 606, 783) Claimant denied urinary/genitourinary symptoms. (Tr. at 606, 608)

At an August 11, 2015 physical examination, Claimant denied hematuria (blood in urine), oliguria (diminished capacity to pass urine), polyuria (excessive production of urine), nocturia (excessive urination at night), and dysuria (pain, discomfort, or burning upon urination). (Tr. at 576)

On September 28, 2015, Dr. Woolums saw Claimant for neurogenic detrusor overactivity with incontinence. (Tr. at 898) Dr. Woolums performed a cystoscopy with intravesical botulinum toxin A injection (Botox). (Id.) That same month, in her Function Report dated September 5, 2015, Claimant reported that she had to self-catheterize every 2 hours. (Tr. at 289)

In December 2015, Claimant reported to Dr. Woolums that she self-catheterized 3-4 times a day. (Tr. at 1316) It was noted that Claimant received a Botox injection on September 28, 2015 that was effective until about two weeks ago. (Id.)

On February 2, 2016, Dr. Woolums saw Claimant for management of neurogenic bladder. (Tr. at 883) She reported that she was self-catheterizing 4-5 times a day. (Id.)

On February 23, 2016 and April 26, 2016, Dr. Woolums saw Claimant for follow up of neurogenic bladder and urge incontinence. (Tr. at 858, 872) Dr. Woolums performed cystoscopy with intravesical Botox injections. (Id.)

On April 12, 2016 and June 28, 2016, Claimant denied hematuria, oliguria, polyuria, nocturia, and dysuria (Tr. 1042, 1049).

On August 11, 2016 and October 19, 2016, Claimant denied genitourinary symptoms. (Tr. at 1096, 1104)

On December 6, 2016, Dr. Woolums saw Claimant for follow up of urge incontinence six months status post cystoscopy. (Tr. at 1069) She reported that she self-catheterized 2-3 times a day. (Id.)

On January 3, 2017, Claimant denied genitourinary symptoms. (Tr. at 1168)

On February 16, 2017, Dr. Woolums saw Claimant for follow up of urge incontinence. (Tr. at 1445) She reported that she continued to perform clean intermittent catheterization (CIC) while at home and used incontinence pads daily. (Id.) She also reported that she self-catheterized every 2-4 hours. (Id.) Dr. Woolums noted that Claimant had "improved significantly" and recommended re-dosing of botulinum toxin in 3-4 months. (Tr. at 1448)

On May 18, 2017, Claimant complained of urinary incontinence but denied dysuria, urinary frequency, urinary urgency, flank pain, suprapubic pain, pelvic pain, dark urine, and hematuria. (Tr. at 1454) Dr. Woolums administered an intravesical Botox injection. (Tr. at 1458)

On June 8, 2017, Dr. Woolums saw Claimant for follow-up care. (Tr. at 1461) Claimant reported that she had been doing "very well" since the May 18, 2017 injection and was very happy. (Id.) Claimant also reported that her incontinence had resolved. (Id.)

Records Related to Back Impairment:

On February 10, 2015, Rida Mazagri, M.D., saw Claimant for complaints of lower back pain. (Tr. at 1277-1278) A physical examination revealed that Claimant walked normally, with no evidence of limping. (Tr. at 1279) She had mild difficulty with heel walking, especially on the left side, but was moving her extremities well. (Id.) Her sensation was intact, and her deep tendon reflexes were symmetrical. (Id.) Dr. Mazagri reviewed a December 2014 MRI that revealed no canal stenosis or neural compromise, and mild disc desiccation with mild disc bulge at L4-5, and

11

"[L]5-[S]1. (Id.) Dr. Mazagri opined that surgical intervention was not indicated. (Id.)

On June 25, 2015, Dr. Mazagri performed an examination which revealed that Claimant walked without a limp. (Tr. at 1231) Claimant had mild difficulty with heel walking but moved her extremities well otherwise, with good strength. (Id.)

On August 13, 2015, Ahment Ozturk, M.D., saw Claimant for complaints of lower back pain since she was a child. (Tr. at 977-978) She reported that she had back surgery at age 7. (Tr. at 977) A physical examination revealed that Claimant was able to stand and walk unassisted. (Tr. at 982) Claimant also acknowledged that there was no limit in her ability to stand, sit, or walk (Tr. at 981), which is consistent with her later report during a psychotherapy session, in April 2017, that she went out dancing with her husband and friends for her birthday. (Tr. at 1523) She also reported to Dr. Ozturk that she could lift 50-100 pounds. (Tr. at 981) The examination further revealed that her spine was midline with normal curvatures, there was no shoulder depression or pelvic tilt, and there was no paraspinal muscle spasm. (Tr. at 982) She walked on her heels and toes without difficulty or pain. (Id.)

On August 20, 2015, Amy Garmestani, M.D., saw Claimant for follow up low back pain/lumbago. (Tr. at 771) Claimant reported that she had been referred by neurosurgery to the pain clinic and was planning on having epidural injections. (Id.) A physical examination was entirely normal. (Tr. at 772-773)

On July 27, 2016, Dr. Ozturk performed a diagnostic lumbar facet nerve procedure. (Tr. at 1106) The diagnosis was lumbar spondylosis. (Id.)

On August 11, 2016 and October 16, 2016, Sherry Perry, FNP, a family nurse practitioner, saw Claimant for procedure follow up. (Tr. at 1095, 1103) Physical examinations revealed that she

was able to stand and walk unassisted, with a non-antalgic gait. (Tr. at 1096, 1104)

On April 6, 2017, Breanna Whitmore, FNP, a family nurse practitioner, saw Claimant for complaints of low back pain. (Tr. at 1160) A physical examination revealed that Claimant was able to stand and walk unassisted, with a non-antalgic gait. (Tr. at 1162)

Diabetes Treatment:

On August 20, 2015, Dr. Garmestani saw Claimant for follow up of diabetes. (Tr. at 771) Claimant's blood glucose was under better control because she was taking her medication. (Id.)

On June 28, 2016, Rodhan Khthir, M.D., saw Claimant for diabetes management; he noted that blood glucose readings were usually good to mildly elevated. (Tr. at 1040)

On July 7, 2016, Dr. Khthir reported that Claimant HbA1c was improving. (Tr. at 1028)

On October 4, 2016, Dr. Khthir noted that blood glucose readings were usually good to mildly elevated (Tr. at 1015), and that Claimant's HbA1c had improved. (Tr. at 1019)

On February 8, 2017, Claimant told Dr. Khthir that her glycemic control was good until January, when she developed bronchitis. (Tr. at 1176) Dr. Khthir noted that currently, blood glucose readings were mildly elevated, especially in the morning. (Id.) Dr. Khthir also noted that Claimant's HbA1c had improved. (Tr. at 1180)

Consultative Psychological Examination:

On September 19, 2015, Richard E. Sexton, Ph.D., performed a psychological evaluation (Tr. at 649-656) Claimant drove to the evaluation by herself. (Tr. at 651) She reported that she had never been treated by a psychiatrist or psychologist in the past, although her physician had prescribed anti-depressant medication. (Tr. at 650) She acknowledged that no treating clinician had ever recommended mental disability leave or medical retirement. (Tr. at 651) A typical day

involved getting dressed, "doing research," and watching television. (Id.) Her hobby was making jewelry. (Id.) She maintained good eye contact, with no abnormalities of movement or signs of physical agitation; her responses were goal-oriented; there was no report of auditory/visual hallucinations, paranoid/delusional ideation, fragmentation of thoughts, flight of ideas, incoherence, circumstantiality, tangentiality, poverty of speech, or perseveration; her associations were well-organized; her mood was depressed and anxious; her affect was appropriate; and she reported frequent mood swings. (Tr. at 651-652) She reported a level of anxiety in the medium range and denied panic attacks or phobic-type reactions. (Tr. at 652)

Memory testing revealed that she could repeat the names of five common objects, repeat a sentence after five minutes, and could name four presidents. (Id.) Dr. Sexton noted that despite Claimant's report of a recent increase in depression, she was maintained in the community and had never required a high level of mental health care. (Tr. at 654) During the evaluation, Claimant demonstrated slight difficulty with attention/concentration and task focus in performing simple and multi-step tasks but denied problems maintaining attention/concentration, persistence, and pace in the completion of work-related duties. (Tr. at 655) Diagnoses included depressive disorder not otherwise specified, and an overall GAF of 66. (Tr. at 653) Dr. Sexton found that Claimant had no limitations in her ability to conform to social expectations in a work setting, and that she was expected to respond appropriately to work place pressures. (Tr. at 655-656) Dr. Sexton opined that Claimant was expected to be able to understand and apply instructions in a work setting consistent with average intellectual functioning. (Tr. at 654-655)

Consultative Internal Medicine Examination:

On November 17, 2015, Dr. Nutter performed an internal medicine examination. (Tr. at

14

726-731) Dr. Nutter noted that Claimant was claiming disability due to "just everything." (Tr. at 726) She indicated that she could not work due to her back and bladder. (Id.) She complained of constant lumbosacral pain, aggravated by bending, stooping, sitting, lifting, standing, and riding in a car. (Id.) She stated that she usually catheterized herself on a regular 2-hour schedule. (Tr. at 727) A physical examination revealed that she ambulated with a normal gait that was not unsteady, lurching, or unpredictable. (Tr. at 728) She appeared stable at station and comfortable in the supine and sitting positions. (Id.) Examination of the legs revealed no tenderness, redness, warmth, swelling, fluid, or laxity or crepitus of the knees, ankles, or feet. (Tr. at 729) Straight leg raising in both the sitting and supine position was normal; Claimant could stand on one leg at a time without difficulty; muscle strength was normal at 5/5 bilaterally in the upper and lower extremities; there was no evidence of atrophy; and sensory modalities were well preserved including light touch, pinprick, and vibration. (Tr. at 730) Claimant could heel and toe walk and perform tandem gait. (Id.) Her grip strength, sensation, and motor skills were intact; and there was no evidence of nerve root compression. (Id.)

Dr. Nutter concluded that Claimant's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, traveling, and pushing and pulling heavy objects was at least moderately impaired due to back pain and neurogenic bladder. (Tr. at 731)

Medical Source Statement:

Rhonda Leffingwell, APRN, FNP-C of Valley Health submitted a letter that was faxed to the Office of Adjudication and Review on March 14, 2017. (Tr. at 1156) Ms. Leffingwell stated that Claimant had "multiple diagnoses that require constant monitoring and managing which would prevent her from functioning in a work environment." (Id.) She also stated that Claimant

had a neurogenic bladder that required constant monitoring and self-catheterization "multiple times during the day." (Id.) Ms. Leffingwell also stated that Claimant had "unstable and uncontrolled diabetes." (Id.)

State Agency Psychological Opinion:

On October 14, 2015, Denise Rabold, Ph.D., performed a mental residual functional capacity assessment based on her review of the record. (Tr. at 116-117) Dr. Rabold found that Claimant retained the ability to perform simple, 1-2 step tasks, and some multi-step 3-4 step tasks that were not fast paced in nature. (Tr. at 117) Dr. Rabold also found that Claimant had no social interaction limitations, and no significant adaptation limitations except for moderate limitations in her ability to respond appropriately to changes in the work setting. (Id.) Notwithstanding these limitations, Dr. Rabold found that Claimant retained the ability to perform in a static work environment that did not require strict production demands. (Id.)

On January 6, 2016, Janet Souder, Psy.D., performed a mental residual functional capacity assessment based on her review of the updated record. (Tr. at 145-146) Dr. Souder's opinion did not differ from that of Dr. Rabold. (Tr. at 116-117, 145-146)

State Agency Medical Opinion:

On November 23, 2015, William Bolz, M.D., performed a physical residual functional capacity assessment based on his review of the record. (Tr. at 115-116) Dr. Bolz found that Claimant could lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull without limitation except as shown for her ability to lift and/or carry (Tr. at 115) Dr. Bolz also found that Claimant could climb ladders/ropes scaffolds occasionally;

16

climb ramps/stairs and stoop frequently, and that her ability to balance, kneel, crouch, and crawl was unlimited. (Tr. at 115-116)

On January 7, 2016, Michael Delphia, M.D., performed a physical residual functional capacity assessment based on his review of the updated record. (Tr. at 143-145) Dr. Delphia's opinion did not differ from that of Dr. Bolz. (Tr. at 115-116, 143-145)

<u>Claimant's Statements Regarding Daily Activities:</u>

In September 2015, Claimant submitted a Function Report indicating that her activities included cleaning the house every two days, doing laundry once a week, feeding and watering her pets, and preparing meals on a daily basis (frozen dinners, sandwiches, and salad). (Tr. at 290-291) She stated that she went outside four times a day and either walked or drove when she went out. (Tr. at 292) She was able to go out alone. (<u>Id</u>.) She shopped in stores for food and cleaning supplies, and was able to pay bills, handle a savings account, count change, and use a checkbook/money orders. (<u>Id</u>.) Her hobbies and interests included watching television and making jewelry, which she did "often". (Tr. at 293) She spent time with others sitting and talking on a daily basis. (<u>Id</u>.)

In November 2016, during an initial psychiatric evaluation, Claimant reported no problems with activities of daily living. (Tr. at 1134)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant testified that she lived alone and drives about two or three times a week; she drove herself to the hearing. (Tr. at 89) She received an associate's degree in accounting. (<u>Id</u>.)

At her last job, she worked in a warehouse lifting cases of paper from one pallet to another. (Tr. at 90) She testified that her neurogenic bladder prevents her from working because she has to

"cath" herself every hour to two hours; she has seven holes in her spine, considered spina bifida and uncontrollable type II diabetes. (Tr. at 90-91)

Claimant testified that her spina bifida causes her to "get fidgety" and pain in her back and legs if she lifts or bends or stands or sits too long. (Tr. at 91) She has sought treatment from a neurologist and pain management, but there is no surgery to cure this condition and sees a family practitioner for it; for medication, she takes gabapentin. (Id.)

For her diabetes, Claimant testified that she takes Jardiance, Victoza, and Lantus; she also takes Prozac, Wellbutrin and now Ativan for her "nerves". (Tr. at 91-92) For sleep, she takes hydroxyzine and trazadone. (Tr. at 92)

In addition to having to catheterize herself every hour or two, she wears pads and pullups because of leakage. (Id.) She began catheterizing herself since age seven, before then, she had a permanent catheter. (Id.) She gets procedures done every so often for her bladder issues and receives Botox injections every three months into her bladder. (Id.) The Botox helps for a day or two, but it wears off; her physician has discussed with her closing her bladder off and putting a tube in her side. (Id.) Her bladder spasms all the time and she has back pain constantly, the Botox is to help control the spasms and slow down leakage. (Tr. at 93) Claimant testified that cold weather and lifting heavy weights makes her back pain worse. (Id.) She explained that her bladder spasms are constant. (Id.) She stated her medication helps ease her back pain some, but the pain will never go away. (Id.) She also received injections in her back, but they never worked and made her back worse. (Tr. at 95-96)

Claimant went to physical therapy for her back, but her physical therapist would not push her to sit on a ball and try to bend over because she has "an extra disc in" her tailbone and it could

"all just shift down and crush", and she was advised not to do anything. (Tr. at 96) She stated this is related to her spinal bifida, plus she has a remnant of a tumor on her spine that was not entirely removed when she was seven. (Id.) She cannot have surgery for this either, because then it will cripple her. (Tr. at 97)

She estimated that she can lift niece, who is ten or fifteen pounds, but "in the end" she starts having problems lifting her. (Tr. at 93-94) Claimant testified that standing for prolonged periods causes pain that shoots from her back to her legs, and she has to sit, and then when she sits, it starts to bother her and she gets fidgety and is always moving up and down. (Tr. at 94) She testified that she cannot lay in a bed, but has to be on a couch where "something's up against my back." (Id.) She estimated that she could stand about 20 minutes. (Id.)

Claimant stated she has no problems with her memory, but sometimes has difficulty maintaining attention and concentration. (Id.) She endorsed having problems getting along with people. (Id.)

During a typical day, Claimant testified that she may get up and vacuum the house, do dishes and maybe cook something; the rest of the time she sits or lays on the couch and watches TV. (Tr. at 94-95)

Claimant testified that back when she was working, she only had to "cath" herself every four to five to six hours, and it was easier to schedule it back then than now; on her last job, it got worse and she had to have a permanent catheter for five or six months. (Tr. at 97) Claimant explained that to "cath" herself, it takes 15-20 minutes; she must use alcohol prep pads to make sure that everything is sterile because she is prone to major bladder infections. (Tr. at 98)

Claimant testified that her sugar levels are unstable and can't get them regulated; it makes her sick to her stomach. (Tr. at 102) She stated that her sugar levels vary and are uncontrolled, for instance on the day of the hearing it was 400, but yesterday it was 141. (Tr. at 102-103)

Vocational Expert ("VE") Testimony:

When asked about a hypothetical individual with the limitations in the controlling RFC, *supra*, the VE responded that the individual could work as a sorter, packer, or cleaner. (Tr. at 100) The VE testified that the individual "could probably squeak by" if she had to take unscheduled breaks every two hours for fifteen minutes, but not if the breaks were taken every hour. (Tr. at 101) He explained that the difference is that every two hours at fifteen minutes is within the acceptable below 15% off-task behavior, but above 15%, which every hour would be, would not be acceptable. (Id.) The VE clarified that at 15% or greater being off-task would preclude sustained employment. (Id.) The VE also stated that missing two or more days per month precludes employment. (Tr. at 101-102)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Claimant's overarching argument concerns the ALJ's treatment of her subjective complaints, which in turn created reversible error in the RFC assessment because it did not "fairly and reasonably" consider all of Claimant's impairments. (ECF No. 12 at 6-7)

The Credibility Assessment:

Claimant has stated that the ALJ failed to explain why she found her statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with the evidence of record in accordance with the pertinent legal authority, despite her complaints being substantiated by the objective medical evidence provided by a consulting (Dr. Nutter) and a treating[3] (Ms. Leffingwell) source. (Id. at 5, 6) In this case, the ALJ properly applied the two-step process espoused by Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), and then proceeded to review Claimant's subjective complaints, which included her testimony, and reconciled them with

---

[3] Claimant also references records from her treating physical therapist (Tr. at 556-573) that corroborate a reduced range of motion which are in conflict with the ALJ's noting Dr. Nutter's finding that Claimant had a "normal range of motion." (ECF No. 12 at 5) Claimant asserts that the ALJ failed to take into account her physical therapist's evidence, however, the ALJ does reference this evidence: "the claimant has occasionally reported lumbar spine tenderness to palpation and a reduced lumbar range of motion (3F/4, 17F/10, 25, 27F/18)." (Tr. at 18, 559, 1127, 1142, 1482) To the extent Claimant argues the ALJ failed to consider this evidence, the undersigned finds the argument lacks merit. Contrary to Claimant's assertion, the ALJ did ***not*** note that Dr. Nutter found Claimant had a normal range of motion, but that Claimant "was noted to have pain, tenderness and ***decreased*** range of motion of the lumbar spine." (Tr. at 18, 726-736) (emphasis added)

the medical evidence of record. (Tr. at 1-19) The ALJ is bound by Social Security Ruling 16-3p, which clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the consistency of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

The ALJ began her analysis of Claimant's initial allegations that she is unable to work because of her neurogenic bladder, spina bifida, type 2 diabetes, spine disorder, high blood pressure, and depression; the ALJ also considered Claimant's testimony that she could not work due to a neurogenic bladder, spina bifida, and diabetes, as well as the effects of her symptoms and pain as a result of these conditions. (Tr. at 16) With respect to Claimant's spina bifida, the ALJ acknowledged Claimant's statements that this condition caused her pain whenever she bends or lifts and that though she takes several medications, they do not completely eliminate her pain. (Id.)

Regarding her neurogenic bladder, the ALJ discussed Claimant's use of catheters, leakage pads and pull-ups, that she had been catheterizing herself since the age of 7, and that she must do so every two hours, a process that takes about 15-20 minutes each time. (Id.) In addition, the ALJ considered Claimant's Botox injections to her bladder every three months and that Claimant attested these helped about a day or two but then wore off and that she continued to have daily bladder spasms. (Id.) The ALJ also mentioned Claimant's testimony that she drove 2-3 times a week and drove herself to the hearing, and that she estimated that she could lift 10-15 pounds, stand 20 minutes, but got "fidgety if she sat too long." (Tr. at 17) The ALJ noted Claimant's testimony that she spent the majority of her day in bed. (Id.)

Next, the ALJ considered the medical evidence of record with respect to neurogenic bladder. Despite Claimant's allegations that she self-cathed every two hours, "other evidence provides different estimates": in February 2015, Claimant reported self-cathing three times a day, though she was "leaking too much"[4] (Tr. at 17, 951); in April 2015, Claimant reported self-cathing every 2-3 hours (Tr. at 17, 921); in December 2015, Claimant reported self-cathing 3-4 times a

---

[4] Claimant reported she "is leaking so much, cath volumes are near zero. Wears Depends uses 2 at same time, 5-6 per day." (Tr. at 951)

day (Tr. at 17, 891); in February 2016, Claimant reported self-cathing 4-5 times a day (Tr. at 17, 883); in December 2016, Claimant reported self-cathing 2-3 times a day (Tr. at 17, 1436); and in February 2017, Claimant reported self-cathing every 2-4 hours. (Tr. at 17, 1445) The ALJ noted that Claimant stated that she had been catheterizing herself since the age of 7, and she had been able to work before; further, Claimant "reported that she had improved significantly in February 2017 and was doing very well and very happy in June 2017."[5] (Tr. at 17, 1448, 1461)

The ALJ also acknowledged that Claimant underwent some medical procedures for the neurogenic bladder, including her hospitalization in December 2014 due to increased suprapubic pain and leakage of urine around a Foley catheter resulting in reconstructive bladder surgery. (Tr. at 17, 430, 511) After her discharge to home with prophylactic antibiotics, the ALJ noted Claimant was given "strict instructions regarding lifting and activities", and though she reported "frequent urinary tract infections" during a physical consultative examination in November 2015, the ALJ further noted that the medical evidence showed that Claimant "only reported one infective since she had reconstructive bladder surgery six months prior."[6] (Tr. at 17, 497, 726) Again, the ALJ noted that Claimant reported that she catheterized herself on a regular two-hour schedule, that she suffered from leakage at times in addition to having complete loss of control of her bladder without warning. (Id.)

With regard to her spinal disorders, the ALJ noted that while medical imaging documents this impairment, physical examination results were inconsistent. (Tr. at 18) For instance, Claimant had been observed to have a normal gait and station (Tr. at 18, 596, 866, 886, 907, 960, 964, 967,

---

[5] Dr. Woolums noted that Claimant's "last Botox was May 18. Since that time she has been doing very well she is very happy. Her incontinence is resolved." (Tr. at 1461)

[6] Claimant reported the single urinary tract infection since her surgery during the internal medicine examination with Dr. Nutter on November 17, 2015. (Tr. at 726)

975, 1162) [7], and in June 2015, she "walked without a limp and had mild difficulty with heel walking" (Tr. at 18, 1231), however, by August 2015, she "walked with mild difficulty" (Tr. at 18, 1199); at the November 2015 consultative exam, Claimant once again exhibited a normal gait, but with pain, tenderness and decreased range of motion of her lumbar spine, with a negative straight leg raise test and intact sensory and motor modalities. (Tr. at 18, 726-736) The ALJ mentioned that Claimant "occasionally reported lumbar spine tenderness to palpation and a reduced lumbar range of motion." (Tr. at 18, 559, 1127, 1142, 1482)[8]

Moreover, the ALJ noted that Claimant's "own reports are also inconsistent", having reported in August 2015 she had "no limit in standing, walking, or sitting, and stated she could lift 50-100 pounds (Tr. at 18, 981) and in April 2017 she reported that she went out dancing. (Tr. at 18, 1523) In sum, because the ALJ found that because the subjective reports and the physical examination results were inconsistent, she determined Claimant's limitations from her spinal disorders were not as severe or as persistent as she alleged, and that the limitation to light work with the postural and environmental limitations adequately accounted for this impairment. (Tr. at 18)

With regard to her symptoms caused by diabetes mellitus, the ALJ noted that while the records document that Claimant's A1C had fluctuated (Tr. at 18, 574, 602, 1005, 1035, 1380, 1550)[9], she had repeated normal monofilament testing which did not warrant any greater limitations in the RFC assessment. (Tr. at 18, 577, 1018, 1180)[10]

---

[7] These records are dated August 20, 2015, April 7, 2016, February 2, 2016, June 23, 2015, March 1, 2016, April 5, 2016, June 7, 2016, February 2, 2016, and April 6, 2017, respectively.

[8] These records are dated February 18, 2015, November 8, 2016, August 30, 2016, and August 18, 2017, respectively.

[9] These records are dated August 11, 2015, July 14, 2015, October 24, 2016, June 29, 2016, December 23, 2015, and May 5, 2017, respectively.

[10] These records are dated August 11, 2015, October 4, 2016, and February 8, 2017, respectively.

In sum, the ALJ found that Claimant was not as limited by her impairments as alleged and her credibility analysis did not offend Fourth Circuit jurisprudence. Accordingly, the undersigned **FINDS** that the ALJ's credibility assessment was supported by substantial evidence.

<u>Evaluation of Opinion Evidence:</u>

Because Claimant takes issue with the ALJ's evaluation of opinion evidence, as a practical matter it is best to review how the SSA governs the criteria for evaluating opinion evidence prior to addressing the ALJ's RFC assessment and fifth step determination; per §§ 404.1527(a)(1), 416.927(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.

As an initial matter, to the extent that Ms. Leffingwell opined that Claimant was disabled as a result of her impairments, the ALJ was under no duty to give any special significance to that opinion. See 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). (Tr. at 20) To the extent that Claimant has argued that the ALJ "failed to give proper weight" to Ms. Leffingwell's opinion, and that she "did not discuss" the opinion "except to disregard it", this argument lacks merit. The ALJ actually considered the treating nurse practitioner's opinion, noting that Ms. Leffingwell reported Claimant had "multiple diagnoses that required constant monitoring and managing which prevented her

from functioning in a work environment", and gave this opinion "little weight because her conclusion is inconsistent with other evidence."[11] (Tr. at 20, 1156) Though curt, the ALJ's assessment of this opinion is appropriate given her review of the evidence. Additionally, because Claimant filed her claim prior to March 27, 2017, as a licensed Advanced Practice Registered Nurse, Family Nurse Practitioner (Certified) (APRN, FNP-C), Ms. Leffingwell was not an "acceptable medical source" pursuant to the Regulations. See Id. §§ 404.1502(a)(7), 416.902(a)(7) ("Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another tile, for impairments within his or her licensed scope of practice (only with respect to claims filed . . . on or after March 27, 2017"). Accordingly, despite having a "treating" relationship with Claimant, because she was not an acceptable medical source, Ms. Leffingwell's opinion was not entitled to "controlling weight."

With respect to Dr. Nutter's opinion, the ALJ gave it "some weight", noting Dr. Nutter's findings that Claimant's ability in performing bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, and pushing and pulling heavy objects was "moderately impaired" because of her back pain and neurogenic bladder. (Tr. at 20, 726-736) Additionally, the ALJ explained Dr. Nutter's opinion was entitled to some weight because he was an examining source, however, she found the opinion "vague and it did not provide any functional limitations aside from noting a moderate impairment." (Id.) The ALJ considered Dr. Nutter's observations, which included Claimant's ability to ambulate with a normal gait, though she had pain, tenderness and decreased range of motion in her lumbar spine, that she had a scar on her back from a prior surgery,

---

[11] The records show that Ms. Leffingwell was copied on Dr. Woolums's treatment notes concerning Claimant's neurogenic bladder from February 2017 through June 2017. (Tr. at 1445-1464, 1551-1554, 1556-1559, 1561-1566, 1568-1571) Of further interest and importance, during that period, those records indicated that Claimant reported "significant" improvement regarding the issues of neurogenic bladder and that her incontinence was "resolved."

though her straight leg raise test was negative, that her grip strength, fine manipulation skills, sensory and motor modalities were intact, and there was no evidence of nerve root compression. (Tr. at 18) As noted *supra*, the Regulations specify that medical opinions include ". . . what you can still do despite impairment(s), and your physical or mental restrictions." Id. §§ 404.1527(a)(1), 416.927(a)(1). Other than Dr. Nutter's opinion that Claimant was "moderately impaired due to back pain and neurogenic bladder" (Tr. at 731), the ALJ is correct that the opinion provides nothing more with respect to what Claimant can still do despite these impairments. In addition to her burden of showing she has a medically determinable impairment, Claimant must demonstrate "a showing of related functional loss." See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (internal citation omitted). The ALJ's evaluation of Dr. Nutter's opinion is further buttressed by the medical records of evidence from Claimant's treating physician, Dr. Woolums, determined that the issues related to her neurogenic bladder had significantly improved, to the point that her incontinence had resolved.

In sum, the undersigned **FINDS** that that the ALJ's explanation for the values she assigned to the opinions provided by Ms. Leffingwell and Dr. Nutter complies with the Regulations as well as this Circuit's jurisprudence, and further **FINDS**, the ALJ's assessment of those opinions was supported by substantial evidence.

The RFC Assessment:

Claimant contends that the ALJ's RFC assessment is reversible error because it does not account for her issues related to neurogenic bladder, specifically where she must self-catheterize every 1-2 hours that puts her off-task between 12%-33% of the workday, which precludes all employment. (ECF No. 12 at 5)

Residual functional capacity represents the *most* that an individual can do despite her limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As an initial matter, the undersigned notes that the parties do not dispute the vocational expert's testimony that an individual taking unscheduled breaks every two hours for fifteen minutes is an "acceptable below [] 15% off-task behavior" that does not preclude employment, however, "15% or greater" would not be acceptable and precludes sustained employment. (Tr. at 101) The parties diverge on whether the evidence supports a finding that Claimant is in fact disabled as a result of her self-catheterizations, therefore, the frequency of Claimant's self-catheterization is a critical component to the ALJ's fifth step determination.

The ALJ noted Claimant's testimony that she had to catheterize herself "every two hours". (Tr. at 16, 17)[12] There is no other evidence of record outside of Claimant's testimony that she had to catheterize herself more often that every two hours; as noted *supra*, the ALJ contrasted

---

[12] Claimant specifically testified that she had to catheterize herself "every hour to two hours." (Tr. at 91, 92, 95, 98)

Claimant's statements concerning the frequency of her self-catheterization with the medical records, ultimately finding that Claimant did not have to self-catheterize more often than every two hours. Because only the ALJ is tasked with determining the particular facts in a case and to resolve the inconsistencies therein, this Court does not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

Moreover, hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As discussed above, the ALJ evaluated the evidence with respect to Claimant's allegation that she had to catheterize herself every two hours, and the vocational expert specifically stated that an individual would be precluded from substantial gainful employment should she require unscheduled breaks every hour for fifteen minutes: in short, being off task at 15% or more is unacceptable in competitive work activity. (Tr. at 101) However, the vocational expert testified that the jobs identified would be unaffected if the individual required an unscheduled break every two hours for fifteen minutes. (Id.) To the extent Claimant has alleged that she needs to catheterize herself more often than every two hours and precludes her from all work, this conflicts with the other evidence of record, as stated *supra*, which is for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Because the ALJ is not required to incorporate every question posed to the vocational expert in her RFC assessment, and only incorporate those limitations established by the record, the undersigned **FINDS** the ALJ's RFC assessment is supported by substantial evidence.

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for Judgment on the Pleadings (ECF No. 12), **GRANT** the Defendant's request to affirm the decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 13, 2019.

Omar J. Aboulhosn
United States Magistrate Judge